**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

ALFRED SUNIGA, III,                          1:10-CV-00090 LJO GSA HC

                Petitioner,       FINDINGS AND RECOMMENDATION
                                                      REGARDING PETITION FOR WRIT OF
    v.                                          HABEAS CORPUS

MIKE McDONALD,

              Respondent.
_____/

      Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is represented in this action by David R. Mugridge, Esq.

**BACKGROUND**

      Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on March 14, 2007, of two counts of murder and enhancements for personal use and intentional discharge of a firearm causing death.  (CT[1] 225-226.)  On April 11, 2007, Petitioner was sentenced to life without parole plus twenty-five years.  (CT 225.)

---

[1]"CT" refers to the Clerk's Transcript on Appeal.

1

1       Petitioner filed a timely notice of appeal.  On July 3, 2008, the California Court of

2 Appeal, Fifth Appellate District ("Fifth DCA"), modified the judgment by striking one of the

3 multiple-murder special findings but affirmed Petitioner's judgment in all other respects in a

4 reasoned decision.  (See Resp't's Answer, Ex. 1.)   Petitioner then filed a petition for review in

5 the California Supreme Court.  (LD[2] 4.)  The petition was summarily denied on October 1, 2008.

6 (LD 5.)

7       On December 29, 2009, Petitioner filed a federal habeas petition in this Court along with

8 a motion for stay and abeyance of proceedings to allow Petitioner to return to state court to

9 exhaust two claims that had not been previously presented to the state courts.  On February 9,

10 2010, the Court determined Petitioner had shown good cause for a stay and granted the motion.

11 Over the course of the next year and a half, Petitioner failed to comply with multiple court orders

12 with respect to the stay.  Petitioner was repeatedly warned that continued failure to comply would

13 result in vacating the stay.  On July 29, 2011, after Petitioner persisted in failing to abide by court

14 deadlines, the Court vacated the stay *nunc pro tunc* to February 9, 2010, and dismissed the

15 unexhausted claims.  Respondent was directed to file an answer to the remaining claims.  On

16 November 2, 2011, Respondent filed an answer.  On December 2, 2011, Petitioner filed a

17 traverse.

18 **STATEMENT OF FACTS**[3]

19 *Prosecution Evidence*

20       At approximately 1:00 a.m. on December 30, 1998, Detective Meek was
dispatched to the Goshen area to assist then-Deputy Boudreaux, who was attempting to

21 catch a suspect who had fled from a vehicle stop Boudreaux had initiated following a
citizen's report of a female in need of help. After a pursuit, the vehicle came to a stop.

22 The driver-[Petitioner]-ran a short distance and then turned, as if to fight. Although
Boudreaux sprayed him with pepper spray, [Petitioner] managed to run again. He was

23 taken into custody within 10 to 20 minutes, and spontaneously stated he pushed her
down, and she deserved it. His breath smelled strongly of alcohol and his voice was

24 slurred.

25

26     [2]"LD" refers to the documents lodged by Respondent with his answer.

27     [3]The Fifth DCA's summary of the facts in its July 3, 2008, opinion is presumed correct. 28 U.S.C.

28 §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
adopts the factual recitations set forth by the Fifth DCA.

2

Meek was then directed to make contact with Cindy Baldiviez,[FN1] who reportedly was the victim of spousal abuse. Cindy was crying and very upset, and she appeared afraid. She advised that the suspect was [Petitioner], her live-in boyfriend at the time and the father of their son, Alfred. Cindy related that she and [Petitioner] had both been at home. [Petitioner] had been drinking for a few hours, when a man Cindy had never met before showed up at the house. The men wanted to go for a ride, but Cindy did not want [Petitioner] to, because they had been drinking. They ended up going for a ride in a van. [Petitioner], who was driving, was very drunk and all over the road, and she told him to pull over so that she could drive, as she was sober. [Petitioner] became very angry and started calling her names. Eventually, he pulled over. The argument continued, and he told her to get out of the van. When she refused, he tried to pull her out of the van by her hair, then began punching her in the head. When she fell to the ground, he kicked her several times. She ran off. This incident occurred around midnight, and Meek observed a goose egg on Cindy's forehead.

> FN1. To avoid confusion, we refer to various individuals by their first names. In addition, we refer to Cindy and [Petitioner]'s son, Alfred Suniga IV, as Alfred. No disrespect is intended.

As of the time of the homicide, Cindy and [Petitioner] had been a couple for approximately 10 years, and had been married for part of that time.

Around 1999 or 2000, Katrina Murillo lived with her grandmother, Olivia Baldiviez; her aunt, Cindy Suniga; and Cindy's husband, [Petitioner]. Cindy and [Petitioner] had their own room. There were many times when Cindy and [Petitioner] argued, but on one particular occasion, the arguments escalated, and Murillo heard loud yelling and what sounded like [Petitioner] hitting Cindy. Murillo heard Cindy tell [Petitioner] to stop hitting her. When Murillo went into the room, Cindy and [Petitioner] both appeared angry, and Cindy was crying. This was something that happened over and over again and that Murillo heard many times.

At approximately 7:15 a.m. on July 1, 2001, Visalia Police Officer Pree was dispatched to a residence on Copper Court, where he contacted Cindy, who was crying and afraid. She related that she had returned home just prior to Pree's arrival, and had found unknown people at her home and numerous beer bottles lying around. She went inside and was telling the people to get out, when [Petitioner] told her to leave. At one point, he produced a shotgun, racked the action, and pointed the weapon at her. He told her that if she was not going to leave, he would make her leave, and, as far as he was concerned, she did not have a house anymore. Cindy then left the residence and contacted the police. Although [Petitioner] was not there, officers found a .12-gauge, pump-action shotgun in the house.

At approximately 2:50 a.m. on July 29, 2002, Visalia Police Officer Alfano responded to a minimart following a call from a woman saying she had been involved in a disturbance with her husband. Upon arrival, he contacted Cindy, who was crying and upset and appeared afraid. She said [Petitioner] had come home intoxicated and accused her of cheating on him. The argument had become heated, and he had pushed her around the room, pulled her hair, and called her names. Alfano responded to the residence, but did not find [Petitioner].

Pauline Baldiviez was Olivia Baldiviez's daughter and Cindy's sister. On September 18, 2005, she and her boyfriend Joe Cruz, Cindy and [Petitioner], and Joe's sister Christina Cruz and her boyfriend Daniel Nanez, left Olivia's house around 7:00 or 8:00 a.m., to go to an Oakland Raiders football game. They traveled in a van. Joe drove. [Petitioner] had a couple of beers and Daniel was also drinking. Although the game did

not start until 5:30 p.m., they left early to make sure they had plenty of time, as they planned to tailgate before the game.

They arrived in Oakland around 2:00 p.m., and had to wait in line to get into the stadium parking lot. While the van was in line, [Petitioner] and Cindy got out at a store. Pauline kept watching for them as the van moved along in line. At one point, the sisters waved at each other. When [Petitioner] and Cindy got back into the van, Pauline heard them arguing. [Petitioner] was upset because he thought Cindy had been waiving at someone else. Cindy was angry. This type of misunderstanding occurred a lot when [Petitioner] was drinking: he would get a little jealous of Cindy or not be quite sure what was going on. [Petitioner] tended to act very inappropriately toward Cindy when he drank, and he frequently cursed at her.

Once inside the parking lot, the group barbecued for a couple of hours. Everyone except Pauline was drinking, and Pauline observed [Petitioner] to have approximately four beers.[FN2] At some point, he and Cindy walked away. They seemed fine and were gone for abut 20 or 30 minutes. When they returned, it was time to eat. [Petitioner] just stood by Cindy and did not interact with the others.

> FN2. Joe Cruz estimated the group took two or three cases of beer with them to the game. He, [Petitioner], Daniel, and Christina were sharing that beer while they were tailgating. By Daniel's own account, he got "pretty wasted" and "was gone." Joe described his own intake in the parking lot as "[q]uite a few" beers, and he "was wasted" by the time they drove home.

A little before 5:00 p.m., the group started cleaning up in preparation for entering the stadium. Pauline and Cindy got into the van to touch up their makeup. The sliding door was open, and [Petitioner] was standing outside the van, right next to Cindy. Pauline heard them arguing and saw Cindy start to cry. [Petitioner] then struck Cindy in the nose with his closed fist. Pauline told him to stop hitting her sister. He did not say anything.

Pauline finished her makeup and went to the back of the van, where everyone was standing. Apparently around this time, Christina saw Cindy sitting in the van, crying. Cindy said she and [Petitioner] were fighting because he was accusing her of looking at all the men who where there in the parking lot. About 10 minutes later, when Pauline went to call Cindy to go, [Petitioner] was gone. Cindy just said he left. The group waited at the van for 10 or 15 minutes. Cindy was crying and seemed nervous. When [Petitioner] failed to return, the group got in line to enter the stadium. They were in this line about 10 minutes, but [Petitioner] still did not come. Cindy had his ticket and she kept looking around, hoping he would come, but eventually the group went on inside.

It was loud inside the stadium, and Pauline did not hear her cell phone ring. When she looked at it, she saw that she had missed [Petitioner]'s call, and that he had left a voice mail message saying he needed to talk to Cindy. Pauline informed Cindy, who tried to call [Petitioner] back, but no one answered. Cindy left the stadium and went to the van to see if he was there, and Pauline believed she even drove around, looking for him, but he was nowhere to be found. After about 30 minutes, she returned to the others, but was very worried.

The group stayed until the game ended, then walked to the van. They did not see [Petitioner], nor was he waiting for them by the vehicle. They waited another 15 minutes, then Cindy said [Petitioner] would probably call his mother, who lived in Goshen, to pick him up. Although Joe was not comfortable with just leaving [Petitioner] behind, the whole group made the decision to go. Everyone then got in the van and drove home. During the ride, Cindy was nervous. She wanted to hurry and go home.

4

When they neared Olivia's house in Goshen, Cindy telephoned to ask if Olivia could go home with her, because she was scared. Olivia agreed. The group arrived at Olivia's house around midnight. Some 10 to 15 minutes later, Olivia, Cindy, and Cindy and [Petitioner]'s children, drove to Cindy's house in Visalia. Once there, seven-year-old Alfred went to bed with Cindy in Cindy's room, while five-year-old Ariah went to bed with Olivia in Ariah's room.

Meanwhile, [Petitioner] telephoned his mother, Rachel Suniga, and asked her for a ride home from the game. A family friend, Angela Fernandez, drove Rachel to Oakland, as Rachel was unable to drive that long a distance.[FN3] They picked [Petitioner] up across from the stadium, where the hotels are located. To Fernandez, he appeared tired and stressed out, although not really upset. She could tell he had been drinking, and he appeared intoxicated to her.[FN4] She overheard him tell his mother that he and Cindy had had an argument, and that Cindy had taken his ticket. He said that he was going to be in big trouble. To Rachel, [Petitioner] did not seem angry. She could tell he had been drinking, although he was not falling-down drunk. He was a little upset, although he became calmer as they drove back to Goshen.

FN3. The trip was approximately four hours, one way.

FN4. When interviewed by police several hours after picking up [Petitioner], Fernandez related that she had seen [Petitioner] intoxicated and, on this occasion, he was not, but had probably had a good six-pack. She also related that [Petitioner] was very upset and could not believe "she" had done this to him.

On the way home, [Petitioner] asked for a bathroom, so they stopped at a store in Manteca. Rachel bought [Petitioner] some beer, although he did not drink the entire six-pack. Fernandez, who was driving, got lost. [Petitioner] told her to backtrack in the direction from which she had come, and that led her to the freeway.

When they reached Rachel's house in Goshen, Fernandez left, while Rachel and [Petitioner] went inside. They both were tired, but [Petitioner] asked if he could take the truck. Rachel invited him to spend the night, as his home in Visalia was about a 15- or 20-minute drive, but [Petitioner] said he had to go home because he had to go to work the next day and had to get his clothes. Rachel told him to wake his father and ask if he could take the truck, a 2001 white Silverado pickup. When [Petitioner] woke his father about 2:00 a.m., [Petitioner] was drinking a beer. His father thought it was a problem that [Petitioner] was drinking and would be driving, but allowed him to take the truck.

Alfred was still awake when [Petitioner] came home, and he went with Cindy to the door in response to knocking and the doorbell ringing. [Petitioner] was acting "[b]ad" and yelling. Cindy let him in. Alfred had seen him drunk before, and he appeared drunk now. Alfred did not see anything in his hands.

Alfred ran back to his mother's room, but Cindy stayed where she was. Alfred heard both his parents yelling and cursing, then Alfred heard four loud whipping noises, like a belt whipping.[FN5] Ariah ran into Cindy's room, where Alfred was. Alfred did not know where Olivia was. When Alfred no longer heard anything, he and Ariah ran out of the room. He saw Cindy on the floor in the bathroom. Olivia was on the floor in the kitchen. Both women were bloody, and neither was able to say anything to him. Alfred then called 911. He did not see [Petitioner] leave the house.

FN5. According to Detective Grant, a small-caliber firearm such as a .22 would make a noise similar to a belt-whipping sound or a firecracker.

Alfred's 911 call was logged in at 2:08 a.m. on September 19. In it, Alfred reported that his mother and grandmother were dead and his father was drunk. Alfred said his father, who was outside, had thrown his mother and grandmother on the ground. Alfred said he did not see it. Police and an ambulance were dispatched as the result of the call.

Visalia Police Officer Alfano arrived at the house, which was near the intersection of Kennedy and Copper, at 2:12 a.m. Upon approach, he could see that the front door was partially open and light was on inside the house. He heard what sounded like a small female inside the residence, yelling for help and basically saying, "'Please don't make Mom be dead.'" When Alfano and other officers entered through the front door, Alfred walked up to Alfano. He was crying and appeared to be very scared. Alfano sent him outside, where other officers could assist him.

Cindy was lying halfway in the bathroom, just off the hall, near the entrance to the residence. There was a strong odor of gunpowder, indicating the incident had just occurred. The officers proceeded to search the residence to see whether the gunman was still inside. In the kitchen, they found Olivia. Ariah came out of the master bedroom and ran to Alfano. She was crying and very scared and upset, and had a portable telephone in her hand. He rushed her to the front door, where he handed her off to another officer. No one else was found inside the house.

Alfano was directed by his sergeant to start assisting with a yard-to-yard search of the area for the gunman, who was assumed to be [Petitioner]. No one was found during the search.

Cindy suffered two gunshot wounds to the face, one of which went through the brain and was, of itself, lethal. She also suffered three gunshot wounds to the upper right back, one of which transected the aortic arch and was, of itself, fatal. All five were inflicted at a distance of at least a couple of feet. Olivia suffered a single gunshot wound to the back that caused her to bleed out into the chest and abdominal cavities, and was fatal within a matter of minutes. It also was inflicted from at least a couple of feet away.

All DNA extracted from evidence found at the scene came from the two victims. No skin or other tissues were found in their fingernail clippings. No firearms or anything suggesting there had been firearms at the house were found. However, Detective Grant recovered several bullets that were consistent with a .22. He determined that at least eight rounds had been fired. He found no shell casings, indicating a revolver had been used.

Not long after [Petitioner] left his parents' house, Rachel received a telephone call from Melissa Omos, the mother of [Petitioner]'s child from a previous relationship. Rachel was told that something had happened at the house on Copper, and that her grandchildren were being taken to the Visalia Police Department. Rachel responded that she had known something was going to happen.

Later that morning, Francine Recendez and Martin Vasquez received word that [Petitioner], Recendez's nephew, was at their home in Selma. When they arrived, [Petitioner] said that something had happened at his house, and that he had shot something with a gun. He was crying and mostly thinking about his children. He did not want to turn himself in, but was convinced to do so, and Vasquez drove him to the Visalia Police Department for that purpose. This occurred roughly around 11:00 or 11:30 a.m.

[Petitioner], accompanied by family members, turned himself in at the Visalia Police Department at approximately 12:50 p.m. on September 19. He had no visible injuries. Officers subsequently searched the white Chevrolet Silverado pickup, in which

6

[Petitioner] had arrived at his aunt's home, for firearms and firearms-related evidence. They found nothing.

Mario Fierro was a Nuestra Familia dropout who had been in prison five times and whose criminal record dated back to 1985. At the time of trial, he was in custody and awaiting sentencing, having pled guilty to second degree burglary. He pled guilty on June 27, 2006,[FN6] with an indicated sentence of four years in prison. He had his attorney contact the district attorney's office in October 2006, and gave a statement on October 17. Although Fierro requested that the district attorney's office make him some kind of deal in his current case in return for his information, nothing was offered to him in return. Fierro was hoping that his sentencing judge would take into consideration his initiative in doing this, as he had never testified against anyone before and his life had been threatened.

> FN6. Fierro testified on March 8, 2007. According to him, sentencing typically occurs a few weeks after a plea. He was scheduled to be sentenced a couple of times, but there were continuances.

Fierro was acquainted with [Petitioner], as they had been in jail together in around 1999 to 2000. In May 2006, when Fierro returned from prison, he was housed in the same unit with [Petitioner]. Sometime in late September or early October, [Petitioner] asked Fierro if he thought the district attorney would offer [Petitioner] manslaughter. As Fierro did not really know about [Petitioner]'s case, [Petitioner] calmly told him, over the course of two conversations, that he and his wife or girlfriend went to a game in Oakland. They got into an argument, and he got mad and left and was unable to see the game. He went to go get drunk and was upset because he was left in Oakland. His mother came and picked him up, and he was pretty angry about the situation. All he could think about on the ride home was killing the woman. When he got back from Oakland, he acquired a pistol that he had in his truck, which was at his father's house, then went to the house and shot her four to five times. He shot her once in the face and the bullet came out through the top of her head. He shot her mother in the lower back. He said that one of his children might have seen him leave, and that he used a low-caliber pistol, which Fierro believed was a .22. [Petitioner] said he thought his wife might have been having an affair, and that he was going to make it seem like somebody else was in the house. [Petitioner] said he had planned on doing it before.

At the time of trial, Samuel Romero was in custody, pending sentencing following his October 13, 2006, no contest plea to "second degree strong arm robbery." His anticipated sentence was four years eight months in prison. In light of the nature of his criminal record, which dated back to 1984, and the fact he was facing 25 years to life as a third striker, he considered four years eight months a fairly good deal.

Around December 27, 2006, Romero got word to the district attorney's office that he might have information about this case. At his first meeting with the district attorney's investigator, Romero opted not to speak because the investigator was not willing to make him any kind of offer. Later, however, Romero changed his mind and, on January 11, 2007, gave a statement, despite the fact the investigator again made it clear the district attorney's office was not making any offers. According to Romero, he had never before given information to the prosecution, although he had told jail staff about drugs in cells and the like. Romero testified in hopes there might be leniency or modification at his sentencing, as his life would be in danger in prison.

Romero had known [Petitioner] for about a year, was housed in the same unit at the jail with him for about eight months, and, as the unit's barber, cut [Petitioner]'s hair several times. [Petitioner] sometimes asked Romero's advice concerning his case. Once,

7

[Petitioner] asked whether Romero knew anything about gunpowder residue and how long it stayed on a person's body or clothing. [Petitioner] said the police did not take such tests from him after the incident, and he thought this would be a major factor in his case.[FN7] [Petitioner] said his case was a double homicide. Although he did not mention names, he said he had "blasted" two people, and that there were no witnesses, other than his eight-year-old son may have seen or heard something. [Petitioner] asked if Romero knew anything about whether his son could be called as a witness at that age. These conversations took place while Romero was cutting [Petitioner]'s hair, before Romero's plea bargain.

> FN7. Due to the fact [Petitioner] had had time to clean up and was wearing different clothing than that described by the witnesses at the scene, Detective Grant made the decision not to perform a gunshot residue test on him. That information was neither contained in a police report nor released to the press.

On November 20, 2006, Romero went to the jail visiting room to meet with his attorney. [Petitioner] and his attorney were there. After both attorneys left, [Petitioner] and Romero remained at their respective tables, waiting to be escorted back to their units. While they were waiting, they started talking. [Petitioner] asked Romero to tell Fierro that [Petitioner] knew what he was up to, and that he (Fierro) was through. [Petitioner] then asked Romero to relay a message to Solomon Vasquez. [Petitioner] said he wanted Vasquez to do him a favor. When Romero asked what it was and suggested maybe he could do it, [Petitioner] kind of laughed and said it was nothing, unless Romero was willing to slice Fierro's throat. [Petitioner] said Fierro was testifying against him or gave information to the district attorney. [Petitioner] was angry. He told Romero that it did not matter anyway, because it would be just a matter of time and that his cousin would get Fierro if [Petitioner] could not do it himself. As they walked out with their escorts, [Petitioner] told Romero to make sure he relayed the message to Vasquez. Romero said he would, but he never did. Instead, he informed Fierro of the conversation.[FN8]

> FN8. Correctional Officer Ortiz confirmed that [Petitioner] and Romero each met with his attorney at the same time on November 20, 2006. Because of the layout of the room, she estimated that [Petitioner] and Romero could have been sitting no closer than 20 to 30 feet apart.

Romero saw [Petitioner] again just after Thanksgiving. Each was in his unit's yard, about 40 feet from each other, and they could yell back and forth. Romero was playing handball, when he heard [Petitioner] yelling to someone that Fierro was going to regret talking to the district attorney. [Petitioner] then called to Romero and asked whether he had relayed the message to Vasquez. [Petitioner] said his family had sold some property or something and that he was willing to pay someone to shut Fierro up.

*Defense Evidence*

[Petitioner] testified that he and Cindy were married for about seven years, and together for around 10. On September 18, 2005, he awoke around 5:00 a.m., in preparation for a trip to an Oakland Raiders game that had been planned for several weeks. Everyone met at Olivia's house; while waiting for the others to get ready, [Petitioner] purchased more beer, as the plan was to barbecue and drink beer at the game. Once everything was loaded, the group went in Pauline's van.

The trip took three to four hours, as the group stopped several times on the way. They reached the stadium about noon, then were parked on the road, waiting, because the gates did not open until 2:00 p.m. While waiting, they drank some beer. When the line started moving, [Petitioner] wanted a different kind of beer, so he and Cindy got out of

8

the van and walked to a nearby store. While [Petitioner] was standing in line to make his purchase, he saw Cindy at the door, signaling to her sister. Although he knew she was waiving at her sister, he told her to come here and asked her what she was doing, and said that Pauline knew where they were at. Cindy was under the misimpression that [Petitioner] was getting angry because he thought she was doing something wrong, but that was never the case. Once they had the beer, they returned to the van.

Once parked, the group began barbecuing. As there was still a little tension between [Petitioner] and Cindy, he suggested they go for a walk. They walked around, talked for a while with some of [Petitioner]'s other family members who were there, and then returned to the van. Things were fine between them; [Petitioner], who did not know the other members of the group very well, was simply minding his own business.

[Petitioner] was not having a very good time and was just standing around, drinking his beer. The others were not including him at all. There was still a little tension between Cindy and him, as they had gotten into another little argument about him not participating with the group. At the van door area, they had a quiet argument; rather than anything escalating, [Petitioner] went for a walk to find a restroom. He did not hit Cindy.

[Petitioner] had to wait in line to use the restroom. When he got back to the van, the others were gone. As he did not have a cell phone with him, he borrowed one from another fan and tried to call them. He did not know any of their numbers, so he called Olivia, who gave him some numbers. He made several calls, and she also said she would try to get hold of them. [Petitioner] was upset and "[n]ot at all" happy about being left, although everything was fine between him and Olivia.

When [Petitioner] realized he was not going to get into the stadium, he walked to a nearby motel, where he knew there was a bar. He telephoned his mother to come and get him, watched some of the game at the bar, and drank some more beer. Although he assumed the van was still there, he had his mother come get him, rather than returning to the van and going home with the group.

Rachel and Angela Fernandez arrived after dark. Once [Petitioner] was in the car, his mother asked what had happened. When he explained, she told him not to be mad. He was not; he felt hurt and abandoned, but he knew it was not Cindy's fault. He felt Pauline had been the one saying to leave him, so he was not upset with Cindy.

There was not much conversation on the drive home. They stopped twice, once to use the restroom, and once when [Petitioner] purchased more alcohol. Once at [Petitioner]'s parents' home in Goshen, Fernandez left. [Petitioner], who was tired and needed to go to work the next day, asked whether he could borrow his father's truck to drive home. His father said that [Petitioner] looked drunk to him and invited him to stay there, but [Petitioner], who was still drinking, needed his work clothes, so he got the keys to the vehicle and drove home.

The drive home took about 20 minutes. It was extremely late and [Petitioner], who was "pretty intoxicated," wanted to go to bed. He did not have any idea whether anyone would be at the house, and he did not have his keys. Upon arrival, he knocked on the door. He just wanted to go in and go to bed. He was tired, intoxicated (although he did not have any trouble getting out of the vehicle and walking to the door), and a little hurt and upset. Cindy let him in. The entryway was dim, and he did not see anyone else. Cindy was very hostile toward him and they started arguing. His memory was "pretty foggy," but he recalled them having an argument that was escalating, and someone coming from the area of his daughter's room, behind him. He had no clue who it was. He did not hear anything, but was unexpectedly pushed in the back and fell to the floor.

9

[Petitioner] had no idea where the gun came from; he had not seen it before and did not have a firearm. He did not shoot the gun. He, Cindy, and the other person whose identity he did not know at the time were in a struggle. Through the struggle, he heard several gunshots. He did not know who pulled out the firearm. He could have shot the gun in the midst of the struggle. He was intoxicated and in shock at what was going on. He saw Cindy on the ground and recognized that the other person was Olivia. She was standing there. He did not see either one of his children. He heard a voice saying to call the cops. He believed it was Olivia. When he heard that, he left. At the time, Olivia was walking toward the living room. [Petitioner] did not think anything was wrong with her and believed she would take care of the children. Had he known otherwise, he would have stayed there with his children. He did not intend to kill anyone. He denied shooting Olivia because she was going for the telephone. He never called 911 or returned to see how his family was. The gun was on the ground; [Petitioner] picked it up and took it with him when he left.

[Petitioner] did not know where he went, except that he was out in the country somewhere and there were a lot of trees. He believed he disassembled the gun, a revolver, and threw it in the orchard because he had no use for it. He ended up in Selma, at his aunt's house. When his aunt was not at home, he waited for her. He was hurt and did not know where to go. When his aunt arrived, he told her that he did not know exactly what happened, but that something bad had taken place at his home. He asked her to tell him it was a bad dream. Although he was hesitant when it was suggested that he turn himself in, he was concerned for his children and agreed. Recendez and Vasquez accompanied him to the police department, where his parents joined them. A blood alcohol test taken following his arrest showed he had no alcohol in his system.

[Petitioner] described Fierro as an acquaintance he had met through the jail system. Although [Petitioner] asked Fierro some court questions, he had only minimal conversation with him. Fierro was a known jailhouse informant, and [Petitioner] denied telling him that he had intentions of killing all the way home from Oakland. [Petitioner] kept copies of police reports, statements, and other papers connected to his case in an open cubbyhole in his cell. Sometimes his cellmate would be in his cell, along with the reports, when he was not. [Petitioner]'s case received a lot of media attention, and other inmates knew about it without learning of it from him.

[Petitioner] was also acquainted with Romero, another known jailhouse informant who was fighting a three strikes case. [Petitioner] and Romero were in the visiting room on the day about which Romero testified, but, while they were waiting to be escorted back after their attorneys left, they were about 15 to 20 feet apart and only exchanged small talk. [Petitioner] did not talk to Romero much because he knew Romero was an informant. [Petitioner] denied telling Romero to give a warning to Fierro; there was a deputy at her station the entire time, and she was able to hear any conversation. Although Romero could have been on the yard at the same time as [Petitioner], [Petitioner] did not communicate with him. Given the distance between yards, he would have had to yell, and there were always deputies walking between the two yards.

[Petitioner] admitted having struck Cindy on occasion. He did not recall the incident about which Katrina Murillo testified, although it could have happened. With respect to the 1998 incident, Cindy jumped in the vehicle, uninvited. When she wanted out, [Petitioner], who was driving, pulled over and she got out. He was intoxicated and may have struck her. He did not recall the 2002 incident, although it could have happened. He was intoxicated a lot, as he had an alcohol problem. He did not remember the 2001 incident happening the way it had been described, although he admitted a shotgun was found in the master bedroom and he knew he was not supposed to have a shotgun because he had been convicted of domestic violence as a result of the 1998

1    incident.

2    (See Resp't's Answer, Ex. 1.)

3                                    **DISCUSSION**

4    I.    Jurisdiction

5            Relief by way of a petition for writ of habeas corpus extends to a person in custody

6    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

7    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

8    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

9    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

10   out of Tulare County Superior Court, which is located within the jurisdiction of this Court.  28

11   U.S.C. § 2254(a); 2241(d).

12           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

13   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

14   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

15   F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

16   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

17   1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

18   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

19   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

20   II.   Standard of Review

21           The instant petition is reviewed under the provisions of the Antiterrorism and Effective

22   Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

23   70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's

24   adjudication of his claim:

25           (1) resulted in a decision that was contrary to, or involved an unreasonable
             application of, clearly established Federal law, as determined by the Supreme
26           Court of the United States; or

27           (2) resulted in a decision that was based on an unreasonable determination of the
             facts in light of the evidence presented in the State court proceeding.
28

1  28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

2      As a threshold matter, this Court must "first decide what constitutes 'clearly established

3  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

4  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

5  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

6  of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other

7  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

8  principles set forth by the Supreme Court at the time the state court renders its decision." Id.

9      Finally, this Court must consider whether the state court's decision was "contrary to, or

10 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

11 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

12 grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

13 Court on a question of law or if the state court decides a case differently than [the] Court has on a

14 set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

15 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

16 state court identifies the correct governing legal principle from [the] Court's decisions but

17 unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

18      "[A] federal court may not issue the writ simply because the court concludes in its

19 independent judgment that the relevant state court decision applied clearly established federal

20 law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

21 A federal habeas court making the "unreasonable application" inquiry should ask whether the

22 state court's application of clearly established federal law was "objectively unreasonable." Id. at

23 409.

24      Petitioner has the burden of establishing that the decision of the state court is contrary to

25 or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

26 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

27 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

28 state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

III.   Review of Claims

A.  Prior Domestic Violence Evidence

Petitioner alleges his constitutional rights were violated by the admission of evidence of prior acts of domestic violence and by the jury instructions with respect to that evidence.

This claim was presented on direct appeal to the Fifth DCA where it was rejected in a reasoned decision. (See Answer, Ex. 1.). Petitioner then raised the claim to the California Supreme Court. (LD 4.) The California Supreme Court denied the claim without comment. (LD 5.) When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion. Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991). In this case, the appellate court analyzed and rejected the claim as follows:

> [Petitioner] raises a number of claims concerning the evidence of his prior acts of domestic violence. He broadly attacks admission of this type of evidence, specifically attacks admission of statements Cindy made to police in conjunction with the prior incidents, and also contends the instructions given by the trial court with respect to the evidence were unconstitutional and conflicting. We address each claim in turn.
>
> A. *Admission of Evidence of Prior Domestic Violence*
>
> The prosecutor moved, in limine, for admission of [Petitioner]'s prior acts of domestic violence against Cindy, under authority of Evidence Code section 1109.[FN10] [Petitioner] objected under section 352. After argument concerning the admissibility of the statements Cindy made to police on the various occasions (discussed *post* ), as well as whether the 1998 incident was too remote and whether Katrina Murillo would be permitted to testify that she saw bruises on Cindy on unspecified dates, the trial court ruled the bruising was not to be mentioned unless more specific information could be

13

provided concerning how and when Cindy was bruised, but that the remaining evidence was admissible. Accordingly, the prosecutor presented evidence of the four instances of prior domestic violence set out in the statement of facts, *ante.*

FN10. Further statutory references are to the Evidence Code unless otherwise stated.

Subject to exceptions not pertinent here, section 1109, subdivision (a)(1) provides: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." [Petitioner] does not contend the discovery provisions of section 1109, subdivision (b) were unmet, that the various incidents did not constitute "domestic violence" within the meaning of subdivision (d) the statute, or that the challenged evidence should have been excluded under section 352.[FN11] Instead, he says section 1109 is unconstitutional, as it violates due process by permitting admission of prior acts of domestic violence to prove a defendant's propensity to commit such acts. Although [Petitioner] did not raise this claim in the trial court, "we will consider the issue on the merits because it involves 'a pure question of law which is presented by undisputed facts.' [Citation.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1061; accord, *People v. Valladoli* (1996) 13 Cal.4th 590, 606; see *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310.)

FN11. Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Generally speaking, evidence of a defendant's conduct is inadmissible to prove his or her propensity or disposition to commit the crime charged. (*People v. Denis* (1990) 0224 Cal.App.3d 563, 567.) Thus, section 1101, subdivision (a) states: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

Section 1108, which deals with evidence of prior sexual offenses, and section 1109, which deals with evidence of prior acts of domestic violence, are express exceptions to the general rule.[FN12] In *People v. Falsetta* (1999) 21 Cal.4th 903, (*Falsetta*), the California Supreme Court held that section 1108 does not violate due process. (*Falsetta, supra,* at pp. 907, 912-922.) [Petitioner] says *Falsetta* was wrongly decided. As an intermediate court, we are, of course, bound to follow it with respect to section 1108. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Insofar as is pertinent to this case, section 1108 is indistinguishable from section 1109.[FN13] For the reasons stated in *Falsetta,* we reject [Petitioner]'s due process challenge to section 1109. In so doing, we agree with the other appellate courts that have considered the issue. (E.g., *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120; *People v. Price* (2004) 120 Cal.App.4th 224, 239-240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jennings, supra,* 81 Cal.App.4th at pp. 1309-1310; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1333-1334; *People v. Hoover, supra,* 77 Cal.App.4th at pp. 1026-1029; *People v. Johnson* (2000) 77 Cal.App.4th 410, 416-420.)

FN12. In addition, subdivision (b) of section 1101 permits admission of prior acts when relevant to prove some fact, such as motive or intent, other than disposition.

14

By pleading not guilty to charges of first degree, premeditated murder, [Petitioner] placed in issue all elements of the offenses, including his mental state and intent. (*People v. Balcom* (1994) 7 Cal.4th 414, 422; see *People v. Williams* (1988) 44 Cal.3d 883, 908.) The prosecution bore the burden of proving, beyond a reasonable doubt, that [Petitioner] acted with a specific intent to kill, and with premeditation and deliberation. The challenged evidence may well have been admissible to show intent and motive, an intermediate fact that may be probative of ultimate issues such as intent and premeditation. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026; *People v. Scheer* (1998) 68 Cal .App.4th 1009, 1017-1018; *People v. Linkenauger* (1995) 32 Cal.App .4th 1603, 1612-1614.)

FN13. Subdivision (a) of section 1108 provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

B. *Alleged Instructional Error*

[Petitioner] next contends that, even if admission of the domestic violence evidence did not constitute error, the trial court nevertheless violated his due process rights by instructing the jury that criminal disposition need only be proved by a preponderance of the evidence and that, if proved, the jury could rely on disposition to find him guilty. He says the instruction undercut the presumption of innocence and the right to proof beyond a reasonable doubt. Since his substantial rights were affected if error occurred, we address the merits of his claim despite the fact he failed to raise it below. (Pen.Code, § 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247.)

Pursuant to CALCRIM No. 852, the trial court instructed the jury:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] ... [¶]

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may but are not required to conclude from the evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit murder or manslaughter as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder or manslaughter. The People must still prove each element of every charge beyond a reasonable doubt."

There is no material difference between CALCRIM No. 852 and CALJIC No. 2.50.02.[FN14] (*People v. Reyes* (2008) 160 Cal.App.4th 246, 251.) CALJIC No. 2.50.02 is,

in turn, the section 1109 equivalent of CALJIC No. 2.50.01, which instructs the jury on how to treat evidence admitted pursuant to section 1108. (*People v. Pescador* (2004) 119 Cal.App.4th 252, 261.) In *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*), the California Supreme Court rejected a due process challenge to CALJIC No. 2.50.01. (*Reliford, supra,* at pp. 1009, 1012-1016; see also *Falsetta, supra,* 21 Cal.4th at pp. 923-924.) [Petitioner] says *Reliford* was wrongly decided. Again, however, we are bound to follow it with respect to the constitutionality of CALJIC No. 2.50.01 (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455) and, by logical extension, the analogous CALCRIM instruction, CALCRIM No. 1191 (*People v. Cromp* (2007) 153 Cal.App.4th 476, 479-480). As there is no material difference between the section 1109 instructions (CALCRIM No. 852 & CALJIC No. 2.50.02) and the section 1108 instructions (CALCRIM No. 1191 & CALJIC No. 2.50.01), we find *Reliford's* reasoning applicable. Based on that case, as well as *People v. Reyes, supra,* 160 Cal.App.4th at pages 251-253, *People v. Pescador, supra,* 119 Cal.App.4th at pages 261-262, and *People v. Escobar, supra,* 82 Cal.App.4th at pages 1097-1101, we reject [Petitioner]'s challenge to the instruction given in his case.

FN14. CALJIC No. 2.50.02 tells jurors, in pertinent part: "If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit [another] [other] offense[s] involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that [he][she] was likely to commit and did commit the crime [or crimes] of which [he][she] is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that [he][she] committed the charged offense[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime."

[Petitioner] contends, however, that when we consider the prosecutor's argument in conjunction with the instruction-something that was not discussed in *Reliford*-there becomes a reasonable likelihood the jury understood the instruction in an improper way. (See *Victor v. Nebraska* (1994) 511 U.S. 1, 6, 22-23; *People v.. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Kelly* (1992) 1 Cal.4th 495, 525.) [Petitioner] says the prosecutor explicitly told jurors they could (1) rely on disposition alone to convict, and (2) convict [Petitioner] by finding to be true facts about the other crimes that had only to be proven by a preponderance of the evidence.

[Petitioner]'s selectively edited version misstates the prosecutor's argument. In reality, the prosecutor stated:

"You heard some uncharged violence. The defendant committed domestic violence that was not charged in this case; abuse against an adult who is a spouse. The defendant pointed a shotgun at Cindy and racked the action. Olivia was there. You heard the officer come testify about it. And you know what? The shotgun was in the house. They found the shotgun that he used. The defendant hits Cindy, pulls her hair, punches her in the head with his fist, and dragged her out of the car, repeatedly calling her a bitch. The defendant pushes Cindy, pulls her hair, and repeatedly calls her a bitch on a different incident. Those kind of look the same, don't they? They look like a pattern of conduct, don't they? Katrina hears Cindy yell, 'Please stop hitting me' more than once. She hears hitting sounds. What did the defendant tell you on the stand? Ah, he doesn't remember that. Could have happened. 'Could have happened, but I-I don't really remember.'

1
2
3
4

"I have to prove to you that these things happened by a preponderance of the evidence, more likely than not. Is it more likely than not that these events happened? If you believe that it is, if you decided that he committed any of these acts, you may, but you're not required to, but you may conclude that the defendant was disposed or inclined to commit domestic violence and that the defendant murdered his wife. *This evidence alone is not enough to convict on the charged crime,* but it can be considered. You can consider it. It's up to you what you do with it." (Italics added.)

5
6
7
8
9
10

The prosecutor's actual argument thus made it clear [Petitioner] could *not* be convicted on disposition alone or on facts that only had to be proven by a preponderance of the evidence. Moreover, the trial court instructed on the presumption of innocence and proof beyond a reasonable doubt. In view of the foregoing, we find no reasonable likelihood the jury misunderstood or misapplied CALCRIM No. 852 in a way that violated [Petitioner]'s constitutional rights. (See *Victor v. Nebraska, supra,* 511 U.S. at p. 6; *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Young, supra,* 34 Cal .4th at p. 1202; see also *People v. Lee* (1987) 43 Cal.3d 666, 677-678 [finding giving of conflicting instructions harmless beyond a reasonable doubt in light of other jury instructions and arguments of counsel].)

11 (See Resp't's Answer, Ex. A.)

12 ### *1. Admission of Prior Acts of Domestic Violence*

13 Petitioner first claims the admission of evidence of prior acts of domestic violence

14 violated his due process rights.  Although the Supreme Court has been "clear" that habeas relief

15 should issue when constitutional errors have rendered a trial fundamentally unfair, the Court has

16 made "very few" rulings with respect to the admission of evidence as a violation of due process.

17 Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009) (citations omitted).  As correctly

18 noted by Respondent, in Estelle v. McGuire, the Supreme Court expressly left open the question

19 of whether the admission of propensity evidence violated the Due Process Clause. 502 U.S. 62,

20 75 n. 5 (1991). Because the Court declined to consider the issue, there is no "clearly established

21 Federal law[ ] as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); Mejia v. Garcia,

22 534 F.3d 1036, 1046 (9th Cir.2008); Alberni v. McDaniel, 458 F.3d 860, 863-67 (9th Cir.2006)

23 (holding no such Due Process right has been clearly established by the Supreme Court).  Insofar

24 as there is no clearly established Supreme Court precedent holding that admission of prior acts

25 evidence violates due process, federal habeas relief is foreclosed.  See 28 U.S.C. § 2254(d)(1).

26 ### *2. Jury Instructions Regarding Prior Acts Evidence*

27 Petitioner also claims the trial court unconstitutionally lessened the burden of proof by

28 instructing the jury with CALCRIM No. 852.  The Supreme Court has held that the fact that an

1   instruction was allegedly incorrect under state law is not a basis for habeas relief. Estelle v.

2   McGuire, 502 U.S. 62, 71 (1991), *citing* Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983)

3   ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review

4   of the wisdom of state evidentiary rules").  Federal habeas courts therefore do not grant relief

5   simply because an instruction may have been deficient. Estelle, 502 U.S. at 72.  The only

6   question is "whether the ailing instruction by itself so infected the entire trial that the resulting

7   conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Estelle,

8   502 U.S. at 72; Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416

9   U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,

10  erroneous, or even "universally condemned," but that it violated some [constitutional right]'").

11  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be

12  considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at

13  72, *quoting* Cupp v. Naughten, supra, 414 U.S., at 147. In addition, in reviewing the instruction,

14  the court must inquire "whether there is a reasonable likelihood that the jury has applied the

15  challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S.

16  370, 380 (1990).  Even if constitutional instructional error has occurred, the federal court must

17  still determine whether Petitioner's suffered actual prejudice, that is, whether the error "had

18  substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

19  Abrahamson, 507 U.S. 619, 637 (1993).

20          In this case, the jury was instructed with CALCRIM No. 852, which as noted by the

21  appellate court is akin to CALJIC No. 2.50.02.  Although "[a]ny jury instruction that reduces the

22  level of proof necessary for the Government to carry its burden is plainly inconsistent with the

23  constitutionally rooted presumption of innocence," Mendez v. Knowles, 535 F.3d 973, 983 (9th

24  Cir.2008), *quoting* Gibson v. Ortiz, 387 F.3d 812, 820 (9th Cir.2004), CALJIC No. 2.50.02 has

25  been held constitutional by several California courts.  See People v. Wilson, 166 Cal.App.4th

26  1034 (2008); People v. Brown, 77 Cal.App.4th 1324 (2000); People v. Reliford, 29 Cal.4th 1007

27  (2003) (upholding the analogous sex offense instruction).  Read in conjunction with the

28  instructions on presumption of innocence and proof beyond a reasonable doubt, it was not

1    unreasonable under the AEDPA for the state court to find no due process violation. 28 U.S.C.

2    § 2254(d)(1).  The claim should be rejected.

3        B.  Right to Confrontation

4        Petitioner next claims that the victim's statements to law enforcement constituted

5    inadmissible hearsay in violation of his Sixth Amendment right to confrontation.

6        This claim was also presented on direct appeal to the Fifth DCA and rejected in a

7    reasoned decision. (See Answer, Ex. 1.).  The claim was then presented to the California

8    Supreme Court, which denied the claim without comment.  (LD 4, 5.)  Accordingly, this Court

9    must "look through" to the decision of the court below that has issued a reasoned opinion.  Ylst,

10   501 U.S. at 804-05 & n. 3.  Here, the Fifth DCA denied the claim as follows:

11          In conjunction with the in limine motion to admit the section 1109 evidence, the
            prosecutor sought admission of Cindy's statements to the law enforcement officers who
12          responded to the various domestic violence incidents. The prosecutor asserted the
            statements were admissible as spontaneous utterances under section 1240, and were not
13          testimonial within the meaning of Crawford v. Washington (2004) 541 U.S. 36
            (Crawford). The trial court agreed.
14
15          [Petitioner] now contends that, even assuming section 1109 and CALCRIM No.
            852 do not violate a defendant's due process rights, admission of Cindy's statements to
16          police violated state law, as they did not fall within a hearsay exception. He further claims
            admission violated his Sixth Amendment rights to confront and cross-examine witnesses,
17          as Cindy's statements were testimonial under Crawford and [Petitioner] had no prior
            opportunity to cross-examine Cindy about them.[FN15] We turn first to the hearsay inquiry,
18          as "in any Crawford analysis, the first question for the trial court is whether proffered
            hearsay would fall under a recognized state law hearsay exception. If it does not, the
19          matter is resolved, and no further Crawford analysis is required." (People v. Cage (2007)
            40 Cal.4th 965, 975, fn. 5 (Cage).)
20
            FN15. Citing to pages 6-7 of the reporter's transcript, [Petitioner] says trial
21          counsel objected on hearsay and confrontation grounds. The record shows no such
            objection, except to the extent counsel questioned whether the requirements of
22          section 1240 were met as to one specific piece of proffered evidence that the
            prosecutor withdrew. Ordinarily, the lack of objection would result in forfeiture of
23          the issue on appeal. (See, e.g., People v. Raley (1992) 2 Cal.4th 870, 892; People
            v. Harmon (1992) 7 Cal.App.4th 845, 849.) Nevertheless, since the statutory and
24          confrontation clause issues were before the trial court by virtue of the prosecutor's
            motion and it is clear the court and parties understood the issues presented, we
25          deem them preserved. (People v. Brenn (2007) 152 Cal.App.4th 166, 173-174; see
            People v. Scott (1978) 21 Cal.3d 284, 290.)

26       1. Section 1240

27          There can be no doubt that Cindy's statements, which were offered for the truth of
         the matters contained therein, constituted hearsay. (§ 1200, subd. (a).) "Except as
28       provided by law, hearsay evidence is inadmissible." (Id., subd. (b).) Pursuant to section

                                          19

1240, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." The theory underlying this exception is that "the declarant's lack of opportunity for reflection and deliberate fabrication supply an adequate assurance of the statement's trustworthiness. [Citation.]" (*Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 272.)

"A trial court's decision to admit evidence under the spontaneous utterance exception to the hearsay rule will not be reversed unless the court abused its discretion. [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 714.) "'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) "Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion....' [Citation.] [¶] Because the second requirement relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]." (*Id.* at pp. 318-319.)

In arguing that the requirements of section 1240 were not met in this case, [Petitioner] points to the lapse of time between events and statements, the fact the statements were given in response to questioning, and Cindy's appearance (crying and afraid, but not in physical shock). These are all circumstances that must be considered. (See *People v. Jones* (1984) 155 Cal.App.3d 653, 661-662.) As the California Supreme Court has emphasized, however, " '[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' [Citation.] [¶] Under the same reasoning, the fact that the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity. [Citations.]" (*People v. Poggi, supra,* 45 Cal.3d at p. 319; *People v. Washington* (1969) 71 Cal.2d 1170, 1176.) "The crucial element ... is ... not the nature of the statement but the mental state of the speaker.... The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. [Citations.] More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. [Citations.] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. [Citation.]" (*People v. Farmer* (1989) 47 Cal.3d 888, 903-904, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

Here, the record supports the trial court's finding of spontaneity with respect to Cindy's various statements. With regard to the 1998 incident, Detective Meek testified that he spoke to Cindy right after the event occurred. She was crying and very upset, and appeared to be afraid. She had a visible bruise and swollen spot on her forehead. As for the 2001 incident, Officer Pree testified that he arrived slightly more than 15 minutes after the event. Cindy was crying and afraid. With respect to the 2002 incident, Officer Alfano described Cindy as upset and crying. She looked like she was afraid. He spoke

with her perhaps 13 minutes after the event. Although in none of the instances does the record disclose the extent to which Cindy's statements were made in response to questioning, the trial court did not abuse its discretion by concluding, based on all the circumstances, that the requirements of section 1240 were met as to each.[FN16] (See, e.g., *People v. Ledesma* (2006) 39 Cal.4th 641, 708-709 [statements admissible where made approximately 15 minutes after event; declarant appeared nervous, but, in response to officer's questions, was able to describe perpetrators in some detail & furnish license number of getaway vehicle]; *People v. Brown* (2003) 31 Cal.4th 518, 540-541 [statements admissible where declarant was crying, shaking, & visibly upset two & one-half hours after event, even though portion of statement was response to question]; *People v. Roybal* (1998) 19 Cal.4th 481, 516 [911 call admissible where made within minutes of event, even though declarant was responding to questions]; *People v. Raley, supra,* 2 Cal.4th at pp. 893-894 [statements admissible, though made some 18 hours after event, where declarant-victim may have been in shock from injuries & was distraught]; *People v. Poggi, supra,* 45 Cal.3d at pp. 319-320 [statements admissible where made approximately 30 minutes after event, in response to questioning, & after declarant had been calmed sufficiently to be able to speak coherently; questions were mostly simple and nonsuggestive, such as "'What happened?'" & "'What happened then?'"]; *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1589-1590 [statements admissible where made approximately 30 minutes after event & after declarant made her way to police station; record furnished no reason to believe officer's questions, to which declarant responded, were anything but routine, nonsuggestive inquiries]; *People v. Smith* (2005) 135 Cal.App.4th 914, 923-924 [statements admissible where, although three to six hours had elapsed, declarant was very distraught, anxious, & had blank look on face].)

> FN16. Defense counsel implicitly conceded as much when he questioned the spontaneity of only one piece of proffered evidence, which the prosecutor ultimately withdrew.

## 2. *Crawford*

We turn now to the trial court's determination of the constitutional issue, which we independently review. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1477-1478.)

As a preliminary matter, respondent argues [Petitioner] should be precluded from raising any confrontation clause argument because he murdered Cindy. In this regard, the rule of forfeiture by wrongdoing extinguishes confrontation clause claims on essentially equitable grounds. (*Crawford, supra,* 541 U.S. at p. 62.) As stated in *Reynolds v. United States* (1878) 98 U.S. 145, 158, "[t]he Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated."

In *People v. Giles* (2007) 40 Cal.4th 833 (*Giles*), the California Supreme Court held that, subject to limitations not at issue in [Petitioner]'s case, the forfeiture by wrongdoing doctrine bars a defendant's objection under the confrontation clause of the federal Constitution when the witness's unavailability for confrontation and cross-examination is caused by the defendant's intentional criminal act. (*Id.* at p. 854.) Under this formulation of the doctrine, [Petitioner] would be precluded from challenging admission of Cindy's statements on confrontation clause grounds, as his intentional

criminal act caused her to be unavailable as a witness. After oral argument, however, the U.S. Supreme Court vacated the California Supreme Court's opinion and held that the forfeiture rule applies only where a defendant engaged in conduct designed to prevent a witness from testifying, so that unconfronted testimony will not be admissible without a showing the defendant intended to prevent the absent witness from testifying. (*Giles v. California* (June 25, 2008, No. 07-6053) 554 U.S. ----, ---- [2008 W.L. 2511298].) As there was no suggestion here that the homicide expressed [Petitioner]'s intent to stop Cindy from reporting abuse or cooperating with a criminal prosecution, we will address his confrontation claim on the merits.

"The Confrontation Clause of the Sixth Amendment [to the United States Constitution] provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In [*Crawford, supra,*] 541 U.S. [at pages] 53-54, [the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' A critical portion of this holding ... is the phrase 'testimonial statements.' Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause. [Citation.] It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." (*Davis v. Washington* (2006) 547 U.S. 813, 821 (*Davis*).

In *Crawford,* the United States Supreme Court declined to give a precise definition of "testimonial statements," although "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' "was given as one formulation of the phrase. (*Crawford, supra,* 541 U.S. at pp. 51-52.) The court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* at p. 51.) In *Davis,* the high court declined to attempt to classify all conceivable statements-even those made in response to questioning by police-as either testimonial or nontestimonial. (*Davis, supra,* 547 U.S. at p. 822.) It did further define the categories, however, stating: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid.,* fn. omitted.) Where the declarant's "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquires' is immaterial. [Citation.]" (*Id.* at p. 832, fn. omitted.)

From *Davis,* the California Supreme Court has derived several basic principles. "First, ..., the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony-to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a

nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage, supra,* 40 Cal.4th at p. 984, fns. omitted.)

Examining Cindy's statements in light of the foregoing authorities, we conclude that the statements admitted with respect to the 1998 incident were testimonial within the meaning of *Crawford* and its progeny. By the time Detective Meek contacted Cindy, he knew [Petitioner] was in custody. Although the situation understandably may still have been very upsetting to Cindy, it no longer constituted an emergency. Viewed objectively, the primary purpose for which Meek took Cindy's statement was not to deal with a contemporaneous emergency, but to produce evidence about past events for possible use at a criminal trial. (See *Davis, supra,* 547 U.S. at pp. 829-830; *Cage, supra,* 40 Cal.4th at pp. 984-986.) Accordingly, and leaving aside application of the doctrine of forfeiture by wrongdoing, admission of Cindy's statements to Meek, without an opportunity for cross-examination by [Petitioner], was a violation of the Sixth Amendment.[FN17]

> FN17. It has been suggested that statements falling within the purview of section 1240 may never be "testimonial," since they are, by definition, made without reflection or deliberation and, thus, are not made in contemplation of their testimonial use in a future trial. (*People v. Corella* (2004) 122 Cal.App.4th 461, 469; see also *People v. Pedroza* (2007) 147 Cal.App.4th 784, 794.) As *Cage* teaches, however, we must consider not only the purpose for which the statements were *given,* but also the purpose for which they were *taken.* (See *Cage, supra,* 40 Cal .4th at p. 984.)

The situation is different with respect to the statements Cindy made in conjunction with the 2001 incident. The reported involvement of a shotgun strongly suggests the primary purpose for which at least Cindy's initial statements were given and taken was to deal with a contemporaneous emergency. Although [Petitioner] was not at the house when Officer Pree arrived, his whereabouts apparently were unknown and there was the possibility he might regain access to the firearm. Thus, even though Cindy was now somewhat protected because an officer was present, both she and the officer reasonably could have been in danger. Accordingly, we find no Sixth Amendment violation. (Compare *Davis, supra,* 547 U.S. at pp. 817, 828 [emergency appeared to have ended once Davis drove away from the premises; no weapons were involved in assault on victim].)

A closer question is presented by Cindy's 2002 statements, but we again think they pass muster under the Sixth Amendment. Although Cindy and [Petitioner] were physically separated when Officer Alfano contacted her, she had had to leave her home due to [Petitioner]'s violence, and, given the early morning hour, it was reasonable to infer that Cindy could not return home until the situation was resolved. Under the circumstances, her statements were not testimonial in nature. (See *People v. Saracoglu, supra,* 152 Cal.App.4th at pp. 1596-1598 & fn. 8.)

A violation of the confrontation clause is subject to harmless-error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1225, & fn. 42; see *People v. Ledesma, supra,* 39 Cal.4th at p. 709.) Factors to be considered in determining whether the error was harmless beyond a reasonable doubt include "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent

of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" (*People v. Mitchell, supra,* 131 Cal.App.4th at p. 1225, fn. omitted, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

In analyzing these factors in the present case, we conclude that any error in admitting any of Cindy's statements to police was harmless beyond a reasonable doubt. Katrina Murillo's testimony regarding the 1999 or 2000 incident did not implicate the confrontation clause, and [Petitioner] does not contend otherwise. Murillo testified to hearing what sounded like [Petitioner] striking Cindy, and Cindy telling him to stop hitting her. Murillo testified that she heard this sort of thing many times. Pauline testified to seeing [Petitioner] strike Cindy in the face with his fist just hours before the homicides. Significantly, [Petitioner] himself admitted having struck Cindy on occasion, including possibly during the 1998 incident, and he testified that he was convicted of domestic violence as a result of that incident. He could have been impeached with this conduct even in the absence of Cindy's statements. (See *People v. Wheeler* (1992) 4 Cal.4th 284, 295-297; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1401-1402.)

(See Resp't's Answer, Ex. A.)

First, to the extent that Petitioner argues that Cindy's statements to the police were inadmissible as a matter of California law, this claim is not cognizable on federal habeas review. See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Smith v. Phillips, 455 U.S. 209, 221 (1982) (federal courts "may intervene only to correct wrongs of constitutional dimension"); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991).

Nevertheless, Petitioner claims the admission of Cindy's statements violated his right to confrontation per Crawford v. Washington, 541 U.S. 36, 68 (2004). In Crawford, the United States Supreme Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the accused had "a prior opportunity for cross-examination." The Crawford holding abrogated, in part, the prior rule that the admission of testimonial hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell under a "firmly rooted hearsay exception" or otherwise bore indicia of reliability. Ohio v. Roberts, 448 U.S. 56, 66 (1980). "Although Crawford did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to

1    government officers bears testimony in a sense that a person who makes a casual remark to an

2    acquaintance does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir.2008), *quoting*

3    Crawford, 541 U.S. at 51.

4         Here, the state court reasonably determined that Cindy's statements made in 2002 and

5    2001 were non-testimonial in nature.  The 2001 statement was provided in order for authorities to

6    deal with a contemporaneous emergency.  The 2002 statement also was provided while Cindy

7    was in the midst of an emergency situation.  As to the 1998 statement, the state court determined

8    that the statement was testimonial in nature.  The court further decided that admission of this

9    statement, without cross-examination by Petitioner, was a violation of his Sixth Amendment

10   rights.

11        Nevertheless, the state court reasonably determined that the error was harmless. Habeas

12   relief is not warranted unless the admission of the evidence had a "substantial and injurious

13   effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623

14   (1993); see also Merolillo v. Yates, 663 F.3d 444 (9th Cir.2011).  No such finding would be

15   warranted in this case.  As discussed by the appellate court, there was overwhelming evidence of

16   Petitioner's prior violent behavior toward Cindy notwithstanding her statements.  Cindy's niece,

17   Katrina Murillo, who lived with Cindy and Petitioner, testified she had heard sounds of Petitioner

18   hitting Cindy, and had heard Cindy pleading with Petitioner to stop hitting her.  (See Resp't's

19   Answer, Ex. A.)  She further testified to hearing this on many occasions. (Id.)  Cindy's sister,

20   Pauline Baldiviez, testified to seeing Petitioner become enraged and strike Cindy in the face, just

21   hours before the murder. (See Resp't's Answer, Ex. A.)  Moreover, Petitioner himself admitted

22   to striking Cindy on occasion, and he admitted he had been convicted of domestic violence as a

23   result of the 1998 incident.  As pointed out by the appellate court, Petitioner could have been

24   impeached with his conduct even in the absence of Cindy's 1998 statement to police. (See

25   Resp't's Answer, Ex. A.)

26        On this record, there is no question that Cindy's statements did not have a "substantial

27   and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 623. The

28   Court finds and concludes that Petitioner should not be entitled to habeas relief on this claim.

1    Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved

2  an unreasonable application of, clearly established Federal law," or an "unreasonable

3  determination of the facts in light of the evidence."  The claim should be rejected. 28 U.S.C.

4  § 2254(d).

5                                    **RECOMMENDATION**

6    Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

7  PREJUDICE.

8    This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

9  United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

10  Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

11  California.  Within thirty (30) days after service of the Findings and Recommendation, any party

12  may file written objections with the court and serve a copy on all parties.  Such a document

13  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

14  to the objections shall be served and filed within fourteen (14) days after service of the

15  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

16  § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time

17  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

18  Cir. 1991).

19

20    IT IS SO ORDERED.

21  **Dated:   March 14, 2012**          **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28